**MILLIKEN & COMPANY, Petitioner,**

v.

**BANK OF CHINA, Respondent/Bank.**

Haima Group Corporation, Weihai No. 1 Carpet Factory and Weihai Haima Carpet Co., Ltd., Respondent/Judgment Debtors.

**No. 09 Civ. 6123 (LMM).**

United States District Court, S.D. New York.

Dec. 6, 2010.

Jennifer Lindsay Rubin, Akerman Senterfitt, LLP, New York, NY, for Petitioner.

Christopher Brady, Hollyer Brady, Smith and Hynes, Lanier Saperstein, Pamela Rogers Chepiga, Allen & Overy, LLP, New York, NY, for Respondent/Bank.

### MEMORANDUM AND ORDER

McKENNA, District Judge.

Respondent Bank of China ("Bank") objects, pursuant to Fed.R.Civ.P. 72, to a Memorandum and Order of Magistrate Judge Francis, dated August 11, 2010,

which denied the Bank's motion for a protective order, precluded the Bank from asserting any lien on an account with the Bank superior to that of petitioner, and required the Bank to produce certain documents and to respond to certain interrogatories. Familiarity with Judge Francis' Memorandum and Order is assumed.

The initial objections (*see* Docket No. 23) have been modified (*see* Docket No. 27) so that the Bank, while continuing to object to Judge Francis' decision to strike the Bank's affirmative defense (regarding its own lien on the account at issue), no longer objects to Judge Francis' determination to award costs and fees (subject, however, to a challenge to the specific amount). The discovery at issue has been made available to petitioner.

In the totality of the circumstances the Court concludes that the payment of costs and fees is an adequate sanction for the delays at issue, which have not been shown to have caused petitioner any serious prejudice, and the objection is sustained only insofar as it objects to the preclusion of the Bank's affirmative defense, but otherwise overruled.[1]

SO ORDERED.

### MEMORANDUM AND ORDER

JAMES C. FRANCIS IV, United States Magistrate Judge.

This case presents several issues related to the acquisition of evidence abroad. One is whether a foreign entity, by failing to move promptly for a protective order, forfeits the opportunity to assert that it should be subject to discovery only under the Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters (the "Hague Evidence Conven-

tion" or the "Convention"). A second is whether the Hague Evidence Convention insulates a party from complying with initial disclosure obligations under Rule 26(a) of the Federal Rules of Civil Procedure. And a third is whether, in the circumstances of this case, the requesting party should be limited to utilizing discovery procedures available pursuant to the Convention.

### Background

On July 31, 2003, judgment was entered in the United States District Court for the District of Nevada in favor of Milliken & Company ("Milliken"), the petitioner in this action, and against Haima Group Corporation ("Haima") and Weihai No. 1 Carpet Factory ("Weihai") (collectively, the "Judgment Debtors") in the amount of $4,077,808.20. (Verified Petition for Turnover of Property Under N.Y. C.P.L.R. § 5225(b) ("Petition"), attached as Exh. 1 to Declaration of Jennifer L. Rubin dated July 9, 2010 ("Rubin Decl."), ¶ 6). When the judgment went unpaid, Milliken commenced a turnover action in New York State Supreme Court against the Judgment Debtors, against Weihai Haima Carpet Co., Ltd. ("WHC")—allegedly the successor to Weihai—and against the Bank of China (the "Bank"), where the Judgment Debtors and WHC maintained accounts. (Rubin Decl., ¶ 5; Petition, ¶¶ 5, 9, 10). On July 7, 2009, the Bank removed the action to this Court based on diversity jurisdiction. In its Answer filed on July 14, 2009, the Bank acknowledged that an entity with a title including the words "Weihai Haima" maintains an account at the Bank, but asserted as an affirmative defense that "[t]he property sought to be turned over to Petitioner is subject to

---

1. The docket does not indicate that Judge Francis has passed on petitioner's specific

objections to certain fees and costs.

claims of and security interests held by the Bank that are superior to any claim of Petitioner's." (Answer of Respondent/Bank Bank of China to the Petition ("Answer"), attached as Exh. 2 to Rubin Decl., ¶ 10 & Fourth Affirmative Defense).

Apparently, the parties did not exchange initial disclosures. However, at a pretrial conference on October 16, 2009, they agreed that Milliken would serve discovery requests on the Bank seeking information relating to any relevant account and to the lien asserted by the Bank. (Rubin Decl., ¶ 8). Accordingly, on November 9, 2010, Milliken propounded interrogatories and document requests. (Declaration of Christopher Brady dated June 1, 2010 ("Brady Decl."), Exhs. A, B). The Bank failed to respond in a timely fashion and ultimately requested an extension until January 15, 2010 to answer the interrogatories and produce documents, to which Milliken consented. (Rubin Decl., ¶ 10). The Bank did not meet this deadline, but instead requested a further extension until February 5, 2010, and Milliken again agreed. (Rubin Decl., ¶ 11). When the Bank still did not respond, Milliken sought the Court's assistance in a letter dated February 16, 2010. (Rubin Decl., ¶¶ 11–12; Letter of Jennifer L. Rubin dated Feb. 16, 2010, attached as Exh. 3 to Rubin Decl.).

On April 5, 2010, I issued a Memorandum Endorsement ordering the Bank to answer the interrogatories and provide the requested documents no later than April 12, 2010, failing which it would be barred from asserting any lien on the subject accounts. (Memorandum Endorsement dated April 5, 2010). This deadline, too, passed with no action by the Bank, and on April 23, 2010, Milliken sought an order requiring the Bank to turn over the monies, striking the Bank's affirmative defenses, and awarding Milliken its costs. (Letter of Jennifer L. Rubin dated April 23, 2010, attached as Exh. 5 to Rubin Decl.). Counsel for the Bank responded by letter dated April 28, 2010, stating that he was "quite surprised" when he received the February 16, 2010 letter from Milliken's attorney, because he had issued formal objections to the discovery on February 5, 2010; he also stated that he had not received the Court's April 5, 2010 Memorandum Endorsement until it appeared as an attachment to Milliken's April 23, 2010 letter. (Letter of Christopher Brady dated April 28, 2010, attached as Exh. 6 to Rubin Decl.). Milliken's counsel, however, never received the Bank's objections until they were attached to the April 28, 2010 letter from the Bank's attorney. (Rubin Decl., ¶ 15).

On May 10, 2010, I held a pretrial conference to discuss the outstanding discovery. At that time, the Bank's counsel submitted a proposed order, which I entered, that required the Bank to provide the information requested by Milliken no later than May 24, 2010, subject to certain confidentiality terms. (Order Concerning Discovery and Confidentiality dated May 10, 2010 (the "5/10/10 Order"), ¶ 2). That order also provided that

> If Respondent Bank of China fails to answer Petitioner's Interrogatories and produce documents as requested in Petitioner's First Set of Requests for the Production of Documents as set forth in this Order, Respondent Bank of China shall be barred from asserting the defense that its Lien on the Account … is superior to any lien on the funds in the Account held by Petitioner.

(5/10/10 Order, ¶ 4). On May 24, 2010, the Bank requested an extension of time until June 1, 2010 to comply with the order or to file a motion, and I granted that application. (Memorandum Endorsement dated May 26, 2010). Counsel for the Bank then served Milliken on or about June 1, 2010

with a motion for a protective order but failed to file it. The docket sheet reveals that the Bank finally attempted to file the motion papers on July 20, 2010, but they were rejected because they were not properly filed electronically. In its motion, the Bank argues that it ought not be required to respond to discovery demands that are not made pursuant to the Hague Evidence Convention.

*Discussion*

### A. *Forfeiture of Hague Evidence Convention Rights*

The Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, opened for signature, March 18, 1970, 23 U.S.T. 2555, T.I.A.S. No. 7444, "prescribes certain procedures by which a judicial authority in one contracting state may request evidence located in another contracting state." *Société Nationale Industrielle Aérospatiale v. United States District Court for the District of Iowa,* 482 U.S. 522, 524, 107 S.Ct. 2542, 96 L.Ed.2d 461 (1987).

> In general terms, the Hague Evidence Convention provides that in civil or commercial matters the courts of one contracting state have a right, by "Letter of Request" via a designated "Central Authority," to "obtain evidence or perform some other judicial act" through the courts of another contracting state, for use in "judicial proceedings, commenced or contemplated". Provision is also made for evidence to be taken by a diplomatic officer or consular agent, or by a court-appointed commissioner, with the permission of a "competent authority" designated by the state where the evidence is to be taken . . . .

Cynthia Day Wallace, *"Extraterritorial" Discovery: Ongoing Challenges For Antitrust Litigation in an Environment of Global Investment,* 5 J. Int'l Econ. L. 353, 363–64 (2002).

Here, Milliken argues, in part, that the Bank of China forfeited its ability to assert that discovery should be conducted either initially or exclusively using Convention procedures because the Bank delayed in moving for a protective order.[1] (Petitioner's Memorandum of Law in Opposition to Bank of China's Motion for Protective Order, and in Support of Sanctions ("Pet. Memo.") at 9–11). Indeed, seven months elapsed from the time that Milliken served the Bank with its discovery requests and the date that the Bank finally served its motion. In between, the Bank repeatedly requested extensions of time to respond without suggesting that it was intending to seek a protective order. And the Bank's counsel even drafted an order precluding the Bank from asserting a lien if it failed to respond.

Similar circumstances were presented in *Cooper Industries, Inc. v. British Aerospace, Inc.,* 102 F.R.D. 918 (S.D.N.Y.1984). There, the "defendant made no effort to seek protective relief when the discovery request was served upon it. It simply failed to respond . . . ." *Id.* at 918. Counsel did raise the issue of the Hague Evidence Convention at a pretrial conference, but the court nevertheless ordered the defendant to produce the requested documents. *Id.* at 919. When the defendant again failed to respond but instead filed a motion for a protective order, the court found that the "defendant, by its conduct, has waived any right to assert the Hague Convention." *Id.*

---

**1.** Milliken contends that the Bank "waived" its right to seek protection under the Convention. Waiver, however, implies the intentional abandonment of a right. The Bank's conduct is therefore more accurately characterized as forfeiture.

At the same time, the court in *Cooper Industries* acknowledged that parties to a litigation are not the only entities with an interest in whether Hague Evidence Convention protocols are followed; the interests of the foreign state where discovery would take place are implicated as well. *Id.* at 919 n. 1. In light of this comity consideration, I am reluctant to deny the Bank's motion on the basis of forfeiture alone. I will therefore proceed to analyze it on the merits.

### B. *The Hague Convention and Initial Disclosure*

■ The Hague Evidence Convention "is not the exclusive means for obtaining discovery from a foreign entity." *First American Corp. v. Price Waterhouse LLP*, 154 F.3d 16, 21 (2d Cir.1998) (citing *Aérospatiale*, 482 U.S. at 539–40, 107 S.Ct. 2542). "Nor is the Convention necessarily the means of first resort." *Id.* (citing *Aérospatiale*, 482 U.S. at 541–42, 107 S.Ct. 2542). Nonetheless, "American courts should [ ] take care to demonstrate due respect for any special problems confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state." *Aérospatiale*, 482 U.S. at 546, 107 S.Ct. 2542.

Both at the time that the Hague Evidence Convention was negotiated and at the time the Supreme Court decided *Aérospatiale,* parties in litigation obtained evidence under the Federal Rules of Civil Procedure exclusively by demanding it from the adversary or from non-parties. Rule 26(a) provided:

> Parties may obtain discovery by one or more of the following methods: depositions upon oral examination or written questions; written interrogatories; production of documents or things or permission to enter upon land or other property, for inspection and other purposes; physical and mental examinations; and requests for admission. Unless the court orders otherwise under subdivision (c) of this rule, the frequency of use of these methods is not limited.

Fed. R. Civ. P. 26(a) (1970). Now, however, parties must disclose at the outset of the case information that will support their position in the litigation. For example, with respect to documentary evidence,

> a party must, without awaiting a discovery request, provide to the other parties . . . a copy—or a description by category and location—of all documents, electronically stored information, and tangible things that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment . . . .

Fed. R. Civ. P. 26(a)(1)(A)(ii). This development raises a new question with respect to the relationship between acquiring evidence under the Federal Rules of Civil Procedure and use of the Hague Evidence Convention: under what circumstances, if any, should a court require a party to resort to Convention procedures to obtain information that an adversary would otherwise be obligated to disclose without a discovery demand?

■ Relegating a party to the Convention in the context of initial disclosure is unwarranted for two reasons. First, the comity interests embodied in the Convention and recognized by *Aérospatiale* are attenuated in this situation. Disclosure is intended to be self-executing. No demand for the production of evidence need be directed to the foreign entity. *Cf. Murphy v. Reifenhauser KG Maschinenfabrik,* 101 F.R.D. 360, 363 (D.Vt.1984) (finding less intrusion on foreign sovereign interests where discovery sought consisted of interrogatories and document requests, in con-

trast to "on-site inspections, photography, depositions, informal interviews and access to the defendant's technical library"). Nor is it necessary to compel production; if the party fails to comply with its disclosure obligation, it is simply precluded from relying on the favorable evidence that it failed to divulge. Thus, with initial disclosure, the sovereignty of the foreign state is implicated to a lesser extent than in traditional discovery where demands for production, often backed by a court order, are directed to information within the borders of a foreign nation.

Second, there are equitable considerations at issue in disclosure that are not always in play in discovery. It is one thing to require the party bringing a claim to resort to Convention procedures in order to obtain evidence from another entity necessary to support that claim. It is entirely a different matter to permit a party to decline to disclose, except pursuant to Convention protocols, information that it expects to use to support the claims or defenses that it has affirmatively asserted. There is no indication that the drafters of the Hague Evidence Convention or the Supreme Court in *Aérospatiale* intended the Convention to be used by a party to avoid producing information underlying the very claims that it positively asserts. *Cf. Reino de Espana v. American Bureau of Shipping*, No. 03 Civ. 3573, 2005 WL 1813017, at *8 (S.D.N.Y. Aug. 1, 2005) ("Because plaintiffs in a civil suit who resist discovery have 'the option of either risking penalties for violation of foreign law or abandoning the lawsuit,' some courts have found hardship of compliance to be 'less significant' in cases where the producing party is the plaintiff.") (quoting *Minpeco, S.A. v. Conticommodity Ser-*

*vices, Inc.*, 116 F.R.D. 517, 526 (S.D.N.Y. 1987)).

■ Here, the Bank of China has alleged as an affirmative defense that it has a lien on the subject account superior to that asserted by Milliken. Accordingly, it was required pursuant to Rule 26(a)(1)(A)(ii) to disclose all documents supporting that representation.[2] The Bank cannot be permitted to obstruct production of the very documents that it would use to support its case and then unveil those documents at trial or in response to a dispositive motion. It is therefore precluded from introducing any documents supporting its defense that it has any lien superior to that asserted by Milliken.

## C. *The Traditional Aérospatiale Analysis*

■ Even if Hague Evidence Convention procedures are not categorically inapplicable to initial disclosure under the Federal Rules of Civil Procedure, the Bank's motion for a protective order is untenable. A determination whether to require a party to follow Convention protocol in order to obtain discovery requires "scrutiny in each case of the particular facts, sovereign interests, and likelihood that resort to those procedures will prove effective." *Aérospatiale*, 482 U.S. at 544, 107 S.Ct. 2542. Thus, principles of comity are central to the analysis.

"Comity," in the legal sense, is neither a matter of absolute obligation, on the one hand, nor of mere courtesy and good will, upon the other. But it is a recognition which one nation allows within its territory to the legislative, executive or judicial acts of another nation, having

---

2. Indeed, counsel was obligated even before asserting the defense to make reasonable inquiry into the underlying facts. Fed. R. Civ. P. 11(b)(3). Presumably, he did so by reviewing the pertinent documents.

due regard both to international duty and convenience, and to the rights of its own citizens, or of other persons who are under the protection of its laws. *Hilton v. Guyot,* 159 U.S. 113, 163–64, 16 S.Ct. 139, 40 L.Ed. 95 (1895). The Supreme Court has specifically identified five factors suggested by the Restatement of Foreign Relations Law of the United States as relevant in guiding a comity analysis:

"(1) the importance to the ... litigation of the documents or other information requested;

(2) the degree of specificity of the request;

(3) whether the information originated in the United States;

(4) the availability of alternative means of securing the information; and

(5) the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located."

*Aérospatiale,* 482 U.S. at 544 n. 28, 107 S.Ct. 2542 (quoting Restatement of Foreign Relations Law of the United States (Revised) § 437(1)(c) (Tent. Draft No. 7, 1986) (approved May 14, 1986)).[3] In addition to these considerations, courts in this circuit take into account two other factors: any hardship the responding party would suffer if it complied with the discovery demands and whether the responding party has proceeded in good faith. *See Gucci America. Inc. v. Curveal Fashion,* No. 09

Civ. 8458, 2010 WL 808639, at *2 (S.D.N.Y. March 8, 2010); *Strauss,* 249 F.R.D. at 439; *Reino de Espana,* 2005 WL 1813017, at *3; *Minpeco,* 116 F.R.D. at 522.[4] "The fifth [*Aérospatiale*] factor—the balancing of national interests—is the most important, as it directly addresses the relations between sovereign nations." *Madanes v. Madanes,* 186 F.R.D. 279, 286 (S.D.N.Y. 1999); *accord Strauss,* 249 F.R.D. at 439; *Reino de Espana,* 2005 WL 1813017, at *3. I will address each consideration in turn as it relates to the facts presented here.

### 1. *Importance of the Information Requested*

■ Courts have diverged in their treatment of the importance of the information requested as a factor in determining whether to require a party to utilize Convention procedures. Some suggest that in order for this factor to be considered favorable to the requesting party, the information sought must be "vital" to the litigation. *See Richmark Corp. v. Timber Falling Consultants,* 959 F.2d 1468, 1475 (9th Cir.1992) ("Where the outcome of the litigation does not stand or fall on the present discovery order, ... courts have generally been unwilling to override foreign secrecy laws." (internal quotations marks and citation omitted)); *Strauss,* 249 F.R.D. at 440 ("Because the scope of civil discovery in the United States is broader than that of many foreign jurisdictions, some courts have applied a more stringent test of relevancy when applying the Federal Rules to foreign discovery.") (citing cases). Others hold that it is sufficient for

---

3. This draft provision was subsequently adopted as Restatement (Third) of Foreign Relations Law of the United States § 442(1)(c). *Strauss v. Credit Lyonnais, S.A.,* 249 F.R.D. 429, 438–39 (E.D.N.Y.2008).

4. In *First American,* 154 F.3d at 22, the Second Circuit referred to four of these factors—

the competing interests of the respective nations; any hardship to the responding party caused by compliance; the importance to the litigation of the information requested; and the good faith of the party resisting discovery—but it did not suggest that the remaining considerations were not relevant.

the requested evidence simply to be relevant. *See Reino de Espana*, 2005 WL 1813017, at *7; *Compagnie Francaise d'Assurance Pour Le Commerce Exterieur v. Phillips Petroleum Co.*, 105 F.R.D. 16, 32 n. 8 (S.D.N.Y.1984).

This is an unnecessary distinction. Because none of the comity factors is in itself dispositive, there is no need to treat them as dichotomous. In other words, the requested evidence need not be rigidly categorized as "vital" or "not vital." Rather, it is necessary only to judge the degree of importance of the information—where it falls on the spectrum between merely relevant at one end and crucial at the other—and then weigh this along with all the other factors. Depending upon those other considerations, then, it may be appropriate in some circumstances to forego Hague Evidence Convention procedures even for merely relevant evidence; in other circumstances, a party might be required to invoke the Convention even for critical information.

In any event, the analysis in this case does not turn on the standard for evaluating the relevance factor, since the information sought by Milliken is clearly crucial to the litigation. As discussed above, it is vital for Milliken to learn how the Bank of China might support its assertion of a superior lien. Other information requested, such as the documents relating to the balance in the subject account, are similarly important. Thus, however this factor is measured, it strongly favors Milliken.

### 2. *Specificity of the Requests*

Milliken has asked the Bank of China " 'to produce a specific, discrete source of information.' " *Gucci*, 2010 WL 808639, at *3 (quoting *Reino de Espana*, 2005 WL 1813017, at *9). It has propounded only five interrogatories and eight individual document requests. (Petitioner's First Set of Interrogatories, attached as Exh. A to

Brady Decl.; Petitioner's First Set of Requests for Production of Documents, attached as Exh. B to Brady Decl.). Each is directed exclusively to the account at issue or any lien asserted by the Bank. As in *Gucci*, where the requesting party sought information limited to specific accounts, 2010 WL 808639, at *3, the requests here are narrowly tailored, and this factor therefore supports Milliken's position.

### 3. *Origin of the Information*

Documents relevant to the subject account as well as to any lien can be found in the Weihai branch of the Bank, located in the People's Republic of China. This consideration thus favors the Bank. Although the Bank, over which this Court has jurisdiction due to the presence of branches in this district, has effective control over documents and information maintained by its branches and could be compelled to make production, "the third factor only addresses the physical location of the documents." *Id.*

### 4. *Alternative Methods of Securing Information*

■ " 'If the information sought can easily be obtained elsewhere, there is little or no reason to require a party to violate foreign law.' " *Reino de Espana*, 2005 WL 1813017, at *9 (quoting *Richmark*, 959 F.2d at 1475). Conversely, "if the information cannot be *easily obtained* through alternative means, this factor is said to counterbalance the previous factor—the location of the documents and information—and weighs in favor of disclosure." *Gucci*, 2010 WL 808639, at *3 (citing *British International Insurance Co. v. Seguros La Republica, S.A.*, No. 90 Civ. 2370, 2000 WL 713057, at *9 (S.D.N.Y. June 2, 2000)).

Here, the only alternative means that the Bank of China has suggested is resort to the Convention procedures. The People's Republic of China acceded to the

Convention in 1998. (United States Department of State, "China Judicial Assistance" ("State Dep't Circular"), attached as Exh. 10 to Rubin Decl., at 1). However, according to a circular published by the United States Department of State,

> While it is possible to request compulsion of evidence in China pursuant to a letter rogatory or letter of request (Hague Evidence Convention), such requests have not been particularly successful in the past. Requests may take more than a year to execute. It is not unusual for no reply to be received or[,] after considerable time has elapsed, for Chinese authorities to request clarification from the American court with no indication that the request will eventually be executed.

(State Dep't Circular at 5). This official analysis rebuts any contention that the information sought in this case is "easily obtained" by means other than an order compelling production by the Bank of China. As one court recently observed,

> Although there is no dispute that the Hague Convention affords an alternative means for securing the information, the outcome of a request pursuant to the Convention is by no means certain, and making the request will undeniably result in delays of unknown, and perhaps considerable, duration. Thus, the mere fact that the Hague Convention provides an alternative method for obtaining the documents is not proof that it is necessarily an effective, or efficient, method for doing so in this case.

*In re Air Cargo Shipping Services Antitrust Litigation,* —— F.R.D. ——, ——, No. 06 Md. 1775, 2010 WL 1189341, at *2 (E.D.N.Y. March 29, 2010) ("*Air Cargo I*"). Indeed, in a subsequent decision in that same case, the court found no viable alternative means of discovery where a response to a request under the Conven-

tion would only be forthcoming upon approval from a ministry of a foreign state. *In re Air Cargo Shipping Services Antitrust Litigation,* No. 06 MD 1775, 2010 WL 2976220, at *2 (E.D.N.Y. July 23, 2010) ("*Air Cargo II*"). Milliken would face a similar obstacle here, since its requests would not necessarily be honored, but would only be taken "seriously" by Chinese authorities. (Declaration of Li Xuebing dated June 1, 2010 ("Li Decl."), attached as Exh. C to Brady Decl., ¶ 11 & Exh. 3).

### 5. Balance of National Interests

The interest of the United States in facilitating discovery is not as substantial in this case as it is in some others. For example, the plaintiffs in *Strauss* alleged that the defendant, a French banking corporation, was liable for providing material support to a foreign terrorist organization and financing acts of terrorism. 249 F.R.D. at 430. Not surprisingly, the court found that the United States has a "profound and compelling interest in combating terrorism at every level, including disrupting the financial underpinnings of terrorist networks." *Id.* at 443–44. Similarly, in *Air Cargo I,* the court observed that "this is a case involving violations of antitrust laws whose enforcement is essential to the country's interests in a competitive economy." —— F.R.D. at ——, 2010 WL 1189341, at *4.

Here, the underlying interest—collection of a judgment by a private party—is not so dramatic. Nevertheless, courts consistently recognize that "the United States has 'a substantial interest in fully and fairly adjudicating matters before its courts.'" *Strauss,* 249 F.R.D. at 443 (quoting *Minpeco,* 116 F.R.D. at 524); *accord Air Cargo I,* —— F.R.D. at ——, 2010 WL 1189341, at *4; *Gucci,* 2010 WL 808639, at *5; *Reino de Espana,* 2005 WL 1813017, at *4. In-

deed, for international commerce to operate efficiently, business obligations must be subject to enforcement and the resulting judgments subject to collection. The fair adjudication of commercial interests, in turn, requires full discovery. *See Gucci,* 2010 WL 808639, at *5; *Reino de Espana,* 2005 WL 1813017, at *4.

On the other hand, the People's Republic of China has an interest in enforcing its law concerning the privacy of bank customers. The Bank has submitted the declaration of Li Xuebing, an attorney practicing law in China. (Li Decl., ¶¶ 1, 2). Mr. Li represents that if the Bank were to comply with Milliken's discovery demands, "it would [be] in violation [of] the Civil Procedure Law and the Commercial Law of China." (Li Decl., ¶ 6). Article 263 of China's Civil Procedure Law provides that a request for judicial assistance "shall be effected through channels provided in the international treaties concluded or acceded to by the People's Republic of China" or through diplomatic channels. (Li Decl., ¶ 8 & Exh. 1). Furthermore, "no foreign organization or individual may, without the consent of the competent authorities of the People's Republic of China, ... make investigations and collect evidence within the territory of the People's Republic of China." (Li Decl., ¶ 8). Under Article 262, when a request is made through the appropriate channels, it is considered by the people's court, which "shall not render the assistance requested by a foreign court, if it impairs the sovereignty, security or social and public interest of the People's Republic of China." (Li Decl., ¶ 8 & Exh. 1). Article 30 of the Commercial Banking Law provides, in turn, that "[a] commercial bank has the right to refuse any entity or individual's inquiry about the account of an entity, unless it is otherwise prescribed by laws and administrative regulations ...." (Li Decl., ¶ 10). Finally, Mr. Li has submitted a letter from the Chinese Ministry

of Justice to the Bank of China dated April 28, 2007, stating that all branches of the Bank must comply with the domestic laws of the People's Republic of China and that where United States courts seek evidence from Bank branches, they shall do so by submitting requests under the Hague Evidence Convention. (Li Decl., ¶ 11 & Exh. 3).

The documented interests of the People's Republic of China, however, are less compelling here than in other cases. In *Gucci,* for example, the court declined to require the parties to follow Convention procedures even though violation of Malaysia's bank secrecy law could result in criminal sanctions, including imprisonment of up to three years and a fine of up to approximately $900,000. 2010 WL 808639, at *6. Similarly, in *Strauss,* the court ordered discovery under the Federal Rules of Civil Procedure notwithstanding a letter from the French Ministry of Justice asserting the Republic of France's interest in following Convention protocols. 249 F.R.D. at 447–50. Here, by contrast, although the letter from the Ministry of Justice refers obliquely to compliance with "the Criminal Procedure Law of the PRC" (Li Decl., ¶ 11 & Exh. 3), the Ministry "has not voiced any objections to disclosure *in this case,* which the Second Circuit has found 'militates against a finding that strong national interests of the foreign country are at stake.'" *Gucci,* 2010 WL 808639, at *6 (quoting *Minpeco,* 116 F.R.D. at 525) (emphasis added).

The balance of national interests, then, tips in favor of proceeding with discovery under the Federal Rules, though perhaps not as definitively as in cases where the interest of the United States is more specific.

### 6. *Hardship of Compliance*

The Bank contends that it is faced with an impossible choice: if it fails to comply

with a court order in this case, it will suffer sanctions in the litigation; if it does comply, "the Bank would be exposing itself to penalties from the government of China, as well as possible civil penalties from its account holder." (Li Decl., ¶ 12). But, as pointed out in another case, "[t]he possibility that [the Bank] will suffer hardship in complying with the discovery order is speculative at best. Although the defendant cites the prospect of [ ] sanctions, ... it has cited no instance in which such sanctions have been imposed." *Air Cargo II*, 2010 WL 2976220, at *2. Likewise, in *Gucci*, the court discounted the prospect of hardship, observing that the responding party "has not submitted any authority regarding the likelihood of prosecution, conviction, or imposition of the maximum sentence or fine, if a party is compelled to disclose information pursuant to a court order." 2010 WL 808639, at *6. Indeed, even in *Strauss*, where the court acknowledged that "French bank secrecy laws have been enforced" and "the French government at least occasionally prosecutes violations of its blocking statutes," the court nevertheless found the defendant's assertions of hardship insufficient to require resort to the Convention procedures. 249 F.R.D. at 455. Here, the Bank's showing of hardship is far less substantial, and this factor therefore favors Milliken.

### 7. *Good Faith*

Whether a party resisting discovery has acted in good faith is certainly a factor to be weighed in whether to impose sanctions, but it is also relevant in determining whether to grant a request to proceed under the Hague Evidence Convention. *See id.* at 456; *Compagnie Francaise*, 105 F.R.D. at 31. Although good faith will not insulate a party from the obligation to respond in discovery, "[b] ad faith delays and dilatory tactics will weigh against the objecting party."

*Strauss*, 249 F.R.D. at 456. That is the case here. The repeated failure of the Bank to produce the requested discovery even after seeking and receiving extensions of the deadline, as well as its failure to comply with the very order that its counsel drafted, can only be interpreted as evidence of bad faith.

\* \* \*

Each of the relevant factors, with the exception of the location of the information, favors discovery without resort to the Hague Evidence Convention. The information requested is critical to the litigation; Milliken's requests are carefully tailored; there is no feasible alternative means of obtaining the evidence; the balance of national interests tilts in favor of utilizing the Federal Rules of Civil Procedure; the Bank has not demonstrated a real likelihood of hardship if it complies with the discovery requests; and it has not acted in good faith. Thus, in addition to being precluded from asserting any lien with respect to the subject account, the Bank shall produce all information requested by Milliken within two weeks of this order, failing which its Answer shall be stricken and judgment by default entered against it.

### D. *Attorneys' Fees*

Among other relief, Milliken seeks an award of attorneys' fees and costs that it has incurred in connection with the instant motion. Where a party does not obey a discovery order, the court may issue a range of sanctions, including an assessment of fees. Fed. R. Civ. P. 37(b)(2). Likewise, if a motion to compel discovery is granted, "the court must, after giving an opportunity to be heard, require the party ... whose conduct necessitated the motion, the party or attorney advising that conduct, or both to pay the movant's reasonable expenses incurred in making

 

the motion, including attorney's fees." Fed. R. Civ. P. 37(a)(5)(A). However, the court may not order this payment if "the opposing party's nondisclosure, response, or objection was substantially justified" or "other circumstances make an award of expenses unjust." Fed. R. Civ. P. 37(a)(5)(A)(ii)-(iii).

■ Here, an award of costs and fees is fully warranted. The Bank repeatedly requested extensions of time to respond to Milliken's requests, yet ultimately failed to do so. Likewise, it failed to comply with my April 5, 2010 Memorandum Endorsement. The suggestion by the Bank's counsel that he never received that order is implausible; it was mailed to counsel by my chambers and never returned as undelivered, and it was also transmitted through the Court's electronic filing system. The Bank even failed to comply with my May 10, 2010 Order, which counsel for the Bank had drafted. Thus, an award of costs and fees is hardly unjust.

By August 30, 2010, counsel for Milliken shall submit an affidavit documenting the time for which compensation is sought, the hourly rates requested, and any expenses incurred. By September 15, 2010, the Bank shall respond to Milliken's submission and shall indicate whether there is any dispute regarding the allocation of liability for these sanctions as between the Bank and its counsel. Milliken shall submit any reply by September 30, 2010.

*Conclusion*

For the reasons discussed above, the Bank's motion for a protective order is denied; the Bank is precluded from asserting any lien on the subject account superior to Milliken's lien; and the Bank shall produce the requested documents and answers to interrogatories within two

weeks of the date of this order. Milliken's application for an award of costs and fees is granted, and the parties shall make their submissions with respect to the amount of those sanctions in accordance with the schedule set out above.[5]

SO ORDERED.

---

5. The remaining relief sought by Milliken, including an order of contempt, is denied without prejudice to renewal if the Bank fails to comply with this order.