# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

IN RE CÔTE D'AZUR ESTATE
CORPORATION

)
)

C.A. No. 2017-0290-JTL

## MEMORANDUM OPINION

Date Submitted: October 5, 2022
Date Decided: December 12, 2022

Jeremy D. Anderson, FISH & RICHARDSON P.C., Wilmington, Delaware; *Counsel for plaintiff Lilly Lea Perry.*

Steven L. Caponi, K&L GATES, LLP, Wilmington, Delaware; *Counsel for defendant the BGO Foundation and for nominal party Côte d'Azur Estate Corporation.*

Dieter Walter Neupert; *Defendant pro se*.

**LASTER, V.C.**

Defendant BGO Foundation (the "Foundation") has moved for the issuance of four letters of request to obtain the assistance of the central authority in Israel to facilitate discovery. The Foundation seeks international assistance to obtain discovery from four Israeli attorneys: Yosef Mendelson, Irit Reich-Ziv, Ze'ev Scharf, and Ran Riff. The court will grant the motions.

## I.        FACTUAL BACKGROUND

The facts for purposes of this decision are drawn from the pleadings, the motions for issuance of letters of request, and the exhibits, affidavits, and declarations that are part of the record. Although the parties remain in the midst of discovery, a considerable factual record already exists. The court held an evidentiary hearing to determine whether the Foundation was subject to personal jurisdiction, and the court made findings relevant to that issue based on what a preponderance of the evidence showed at that stage of the case. *See Perry v. Neupert (Jurisdictional Decision)*, 2019 WL 719000 (Del. Ch. Feb. 15, 2019). The parties also have provided the court with extensive documentary submissions in connection with the numerous motions that they have filed. *See In re Côte d'Azur Est. Corp. (Counterclaim Decision)*, 2022 WL 4392938, *6–7 (Del. Ch. Sept. 19, 2022) (describing record). Nevertheless, what follows are not formal factual findings, but rather how the court views the record for purposes of a discovery ruling.

## A.    The Events Giving Rise To This Litigation

Non-party Israel Igo Perry died on March 18, 2015. He was survived by his wife Lilly Lea Perry, who is the plaintiff, and their two daughters, Tamar and Yael Perry.[1] Mr. Perry's last will and testament named Dieter Neupert, the other defendant in the case, as the executor of his estate. Neupert is Swiss lawyer who was Mr. Perry's longtime advisor and confidant.[2] Neupert was the architect of Mr. Perry's estate plan, which involved a complex network of entities called the "Structure." Louis Oehri & Partner Trust reg. ("LOPAG"), a Liechtenstein commercial trust company, formed and controlled all of the entities in the Structure. Neupert and Louis Oehri co-founded LOPAG in 1989, and they worked hand in hand to create the Structure and assist Mr. Perry with what are known in the trade as tax minimization and asset protection strategies.

Neupert and representatives of LOPAG told Lilly that when Mr. Perry died, he was the sole member of Côte d'Azur Estate LLC ("Côte d'Azur"), a Delaware limited liability

---

[1] My standard practice is to identify individuals by their last name without honorifics. When individuals share the same last name, my standard practice is to shift to first names. Using Mr. Perry's first name (Israel) can be confusing, because key events took place in the State of Israel. This decision therefore refers to him as "Mr. Perry."

This decision periodically uses terms such as "the Perry family" or "the members of the Perry family" to refer to Lilly, Tamar, and Yael. By describing the Perry family in this fashion, this decision is not suggesting that other individuals do not qualify as members of the Perry family under a broader definition.

[2] Although Mr. Perry named Neupert to the role of executor in his will, Lilly contested Neupert's ability to serve, and Neupert never secured authority to act as executor. Instead, Tamar and another individual were appointed as co-executors of Mr. Perry's estate.

2

company. Côte d'Azur owned La Treille, a villa in the south of France (the "Villa"), which served one of the family's residences.

Neupert and representatives of LOPAG told Lilly that the member interest in Côte d'Azur constituted Mr. Perry's personal property that passed to his estate under his will. They told Lilly that as Mr. Perry's sole heir under his will, she beneficially owned the equity in Côte d'Azur, subject to the administration of Mr. Perry's estate and the claims of any creditors.

Lilly, Tamar, and Yael disagreed about the disposition of Mr. Perry's wealth. One point of contention was control over the Villa. Mr. Perry had sought to address that issue and anticipate other potential disputes by dictating a document known as the "Letter of Wishes" just before his death. In the Letter of Wishes, Mr. Perry outlined how he wanted LOPAG and its representatives to manage the assets in the Structure after his death. Technically, LOPAG was not legally bound to follow the Letter of Wishes, but as a business matter LOPAG would attempt to fulfill its client's requests.

In the Letter of Wishes, Mr. Perry stated that he wanted the Villa transferred to a trust in the Structure known as the Liza Trust. He expressed a desire that Lilly have primary use of the Villa during her lifetime, but that Tamar and Yael be able to use it as well.

When the intra-familial disputes arose, Neupert and LOPAG tried to broker a settlement. They hoped to achieve a resolution that would implement the substance of the Letter of Wishes. Their efforts led to settlement discussions that continued over many months and involved numerous issues (the "Settlement Discussions"). The ownership of the equity in Côte d'Azur was one of the issues on the table.

3

During the Settlement Discussions, Lilly, Tamar, and Yael were represented by separate counsel and pursued their own interests. LOPAG had its own counsel and pursued its own interests. Neupert was omnipresent. Mendelson and Reich-Ziv represented Lilly. Scharf and Riff represented Tamar.

During the discussions, Lilly and her advisors asserted that Lilly beneficially owned the member interest in Côte d'Azur. They maintained that Mr. Perry owned the member interest at his death, that it constituted personal property that passed to his estate, and that Lilly stood to inherit the member interest as his sole heir. That was exactly what Neupert and LOPAG had told them, and it tracked what Neupert and LOPAG believed and were saying.

Tamar and her advisors disagreed. They argued that in the Letter of Wishes, Mr. Perry expressed his desire to have the Villa transferred to the Liza Trust and for LOPAG to ensure that Tamar and Yael had the ability to use the Villa. Tamar and her advisors agreed with Lilly and her advisors that until that point, Mr. Perry was the sole member of Côte d'Azur and that Côte d'Azur held title to the Villa. But they would not concede that the member interest in Côte d'Azur passed to Mr. Perry's estate or that Lilly stood to inherit the equity interest, and with it sole ownership of the Villa, following probate. Were that so, then when Lilly became the owner of the Villa, she would be able to prevent Tamar and her family from using it. To counter Lilly's claim, they relied on the Letter of Wishes. Because the Letter of Wishes was non-binding, Tamar and her advisors had difficulty explaining how that argument worked. Their main theory was that the Letter of Wishes actually was binding because it constituted a second will.

4

The Settlement Discussions took place against the backdrop of tax issues in France. In March 2016, while those discussions were ongoing, a French tax inspector contacted the law firm of Olswang France LLP ("Olswang") to obtain documents as part of an audit of Côte d'Azur's corporate income taxes for tax years 2013 and 2014. Julien Monsenego of Olswang was a French attorney who had represented Mr. Perry on tax issues,

Côte d'Azur's tax filings in France had always identified Mr. Perry as the ultimate beneficial owner of its equity. As part of the audit, the tax inspector wanted documents confirming Mr. Perrys status as the ultimate beneficial owner of Côte d'Azur as of January 1, 2013, and January 1, 2014.

Neupert told Monsenego that the documents demonstrating Mr. Perry's ownership had been lost when the law firm of Coudert Brothers declared bankruptcy. Providing new documentation was administratively difficult because no one had authority to make representations on behalf of Côte d'Azur. The executor of Mr. Perry's estate could act on behalf of Côte d'Azur, and Mr. Perry's will named Neupert as the executor of his estate, but the will had not been probated, so documents empowering an executor had not yet issued. Neupert came up with the idea of deceiving a registered agent in Delaware into issuing documentation that he could provide to the French tax authorities by representing falsely that he had authority as executor to act on behalf of Côte d'Azur. In a contemporaneous email, he took pride in his ability to fool the Delaware rubes, writing:

> [A]s I do not have the grant of authorisation from the British Probate Court, the only way around was to convince the new registered agent in Delaware, The Company Corporation, that I am the Executor of the Last Will and therefore the legitimate new Director of Cote d'Azur (fortunately in Delaware they do not know anything about UK probate procedure).

*Jurisdictional Decision*, 2019 WL 719000, at \*13.

Neupert later circulated a resolution he received from the registered agent in Delaware that would appoint him as manager of Côte d'Azur. The signature line read, "Lilly Perry[,] Member." *Id.* Tamar objected, complaining that Neupert had no authority to declare that Lilly was the sole member of Côte d'Azur. Tamar did not want to concede that point because it would undermine her position in the Settlement Discussions. She certainly did not want to provide the French tax authorities with any documentation to that effect until a settlement agreement had been signed. The dispute continued for more than a week, during which Neupert insisted that Côte d'Azur's equity was part of Mr. Perry's estate. *Id.*

Nor was the audit the only tax issue in France. Under French tax laws, a non-French entity that owns French real estate is subject to an annual tax equal to 3% of the market value of the real estate. The tax does not apply if the entity files a tax return identifying its ultimate beneficial owner, who is then subject to the French wealth tax. Côte d'Azur's tax filings always identified Mr. Perry as its ultimate beneficial owner, thereby avoiding the 3% entity-level tax. Based on what Neupert, LOPAG, Lilly, and her advisors believed about the ownership of Côte d'Azur at the time of Mr. Perry's death, Côte d'Azur's tax filing in 2016 needed to identify Lilly as the ultimate beneficial owner. Once again, Tamar resisted making the tax filing because it would confirm Lilly's position on ownership and undercut her argument about the Villa passing to the Liza Trust.

Olswang obtained extensions from the French tax auditors that pushed the response date out to May 1, 2016. The tax filing for the 3% real estate tax was due on May 15, 2016.

6

*Counterclaim Decision*, 2022 WL 4392938, at *29. The challenge was to resolve the disputes before the May deadlines.

By April 2016, the Settlement Discussions had resulted to an advanced draft of a proposed settlement agreement (the "April 2016 Draft"). With resolution seemingly in sight, Neupert, Lilly, and her advisors wanted Olswang to inform the French tax authorities that Lilly was the ultimate beneficial owner of Côte d'Azur. On May 4, 2016, Neupert told Monsenego to make that declaration. He also represented that he would provide confirmation that in prior tax years, Mr. Perry was the sole owner of the equity in Côte d'Azur until his death. *Id.* at *30.

But Tamar objected. She did not want Lilly identified as the ultimate beneficial owner of Côte d'Azur until the settlement agreement was signed. That same day, she contacted Monsenego and instructed him not to identify Lilly as the ultimate beneficial owner without her specific approval. *Id.*

On May 6, 2016, Tamar relented. She agreed that Lilly could be identified as the ultimate beneficial owner of Côte d'Azur on the 3% tax return. Neupert sent an email to Tamar and the Perry family advisors confirming her agreement and noting that in exchange, Lilly and LOPAG had agreed to include language in the settlement agreement providing that when Lilly died, the Villa would be handled in accordance with the Letter of Wishes. Neupert believed that with that point resolved, everyone could sign the settlement agreement. *Id.*

Two days later, Neupert circulated revised language for the settlement agreement, a copy of the deed for the Liza Trust, and a draft document titled "Written Consent of the

Members of Côte d'Azur appointing Dr. Neupert as the Manager." *Id.* He described the written consent as "[t]he form from Delaware which you should sign in order that I can get the official confirmation for the French Tax Authorities (our French tax advisor is waiting desperately)." *Id.*

The revised settlement agreement accepted Lilly's inheritance of Côte d'Azur's equity as the baseline and gave Lilly the principal right to use the Villa during her lifetime, while preserving Tamar and Yael's ability to visit. Lilly also agreed to execute any documents that the trust protectors for the Liza Trust might request so that the Villa would pass to the Liza Trust when Lilly died. *See id.* at *29.

Tamar still would not go along until the settlement agreement was signed. She wrote directly to Monsenego and warned him that Neupert had been acting strangely and contrary to Mr. Perry's wishes. *Id.* at *31.

At this point, Yael began voicing concerns and demanding changes to the settlement documents. Her last minute demands caused the Settlement Discussions to break down.

Neupert and LOPAG sought to force the family members back to the table. They targeted Lilly, and as a source of pressure, they plotted to cut off her access to the Villa.

To achieve that goal, Neupert and LOPAG reversed their position about the ownership of Côte d'Azur. They now asserted that before his death, Mr. Perry transferred his member interest to the Foundation, one of the entities in the Structure. If the Foundation controlled Côte d'Azur, then Neupert and LOPAG controlled the Villa.

As evidence of the transfer, Neupert and LOPAG relied on a Deed of Assignment dated May 1, 2013. They now claimed that the Deed of Assignment effectuated a transfer

8

of the member interest in Côte d'Azur to the Foundation. Neupert and the LOPAG representatives had acknowledged previously and repeatedly that the transfer contemplated by the Deed of Assignment was never carried out.

In June 2016, in an effort to bolster their new position about the ownership of Côte d'Azur, Neupert and LOPAG engaged in self-help. Neupert caused the Delaware registered agent that he had been working with to file a certificate of conversion with the Delaware Secretary of State that converted Côte d'Azur into a corporation. Neupert also caused the registered agent to file a certificate of incorporation that authorized the issuance of 10,000 shares of common stock. There are documents which Neupert and LOPAG created later that purport to issue all of the corporation's shares to the Foundation.

With Neupert and LOPAG attacking her claim to the Villa, Lilly allied with Tamar. Their opponents were Yael, Neupert, and LOPAG.

## B.    Lilly Pursues This Lawsuit And Conducts Jurisdictional Discovery.

Starting in the second half of 2016, litigation broke out in various jurisdictions. In April 2017, Lilly filed this action. She contends that (i) the Deed of Assignment did not effectuate an immediate transfer of Mr. Perry's member interest in Côte d'Azur to the Foundation and (ii) Mr. Perry subsequently decided not to carry out the transfer because of adverse tax consequences in France. She maintains that Mr. Perry remained the sole member of Côte d'Azur when he died. Consequently, Neupert and LOPAG had no authority to convert Côte d'Azur into a corporation or to issue shares of stock to the Foundation.

One of the early battles in the case concerned whether Lilly could name the

9

Foundation as a party. The court held that Lilly could. *See Perry v. Neupert*, 2017 WL 6033498 (Del. Ch. Dec. 6, 2017).

After Lilly added the Foundation as a defendant, the Foundation moved to dismiss for lack of personal jurisdiction. The court held that Lilly had made a sufficient showing to conduct jurisdictional discovery. Dkt. 74.

During jurisdictional discovery, the Foundation stipulated that Mr. Perry never executed any additional documents to implement the Deed of Assignment, and Dominik Naeff, a principal of both LOPAG and the Foundation, testified that the Deed of Assignment was never implemented. The discovery record included contemporaneous documents in which Naeff and Neupert acknowledged that the Deed of Assignment was never implemented.

## C. The Court's Factual Findings At The Jurisdictional Stage

The court held a two-day evidentiary hearing to determine whether personal jurisdiction existed over the Foundation. The court concluded that personal jurisdiction over the Foundation exited because the Foundation conspired with Neupert to commit torts with a sufficient nexus to Delaware. *Jurisdictional Decision*, 2019 WL 719000, at *37.

In reaching this conclusion, the court made findings of fact based on what the evidentiary record showed at that stage by a preponderance of the evidence. The court's factual findings included the following:

- Mr. Perry never executed the documents necessary to implement the Deed of Assignment. *Id.* at *7.

- Mr. Perry decided not to complete the transfer to avoid adverse tax consequences in France. *Id.* at *8.

10

- On March 28, 2015, Naeff wrote to the Perry family's advisors, including Neupert, that the Deed of Assignment "was never executed." *Id.* At the evidentiary hearing, Naeff testified that by "never executed" he meant "that this transfer has not been completed or finalized." Naeff Tr. 53.

- In August 2015, Neupert wanted to claim that Côte d'Azur had been transferred into the Structure. He and Naeff discussed whether they could use the Deed of Assignment to make such a claim, but they agreed that it had never been implemented. *Jurisdictional Decision*, 2019 WL 719000, at \*25.

- In August 2016, Neupert and Naeff claimed to have discovered the Deed of Assignment and that it had transferred the equity of Côte d'Azur to the Foundation. *Id.* at \*17.

- To bolster their claim about the Deed of Assignment, Neupert and Naeff sought a legal opinion as to its effectiveness. When the law firm would not deliver the requested opinion, Neupert fabricated documents. *Id.* at \*17–21.

- During late September or early October 2016, Neupert and Naeff fabricated a power of attorney and backdated it to February 5, 2016. *Id.* at \*18.

- During December 2016, Neupert and Tanja Tandler, one of his personal assistants, created a board resolution and stock certificate, which they backdated to July 1, 2016. *Id.* at \*21.

Based on these and other events, Lilly is pursuing claims for fraud, conversion, and tortious interference with contract against Neupert and the Foundation. She seeks a decree invalidating (i) the issuance of shares to the Foundation and (ii) the conversion of Côte d'Azur into a corporation.

The court's factual findings only addressed the issue of personal jurisdiction, not the merits. After still more motion practice, the parties began merits discovery. As part of that process, both sides have asked the court to issue letters of request to obtain discovery from various foreign jurisdictions. In total, the parties have sought twenty-one letters of

11

request. Lilly has sought three. The Foundation has sought eighteen.

**D.       The Letters Of Request**

The Foundation currently seeks the issuance of letters of request to obtain discovery from Mendelson, Reich-Ziv, Scharf, and Riff. Each is an Israeli lawyer and non-party located in Tel Aviv, Israel.

Mendelson is the name partner in Yosef Mendelson & Co. Law Office (the "Mendelson Firm"). The Mendelson Firm advised Lilly during the Settlement Discussions and negotiated the April 2016 Draft. Mendelson was the principal lawyer who led the team. Reich-Ziv is a lawyer with the Mendelson Firm who was part of the team.

Scharf is the name partner in Ze'ev Scharf and Co. Law Offices (the "Scharf Firm"). The Scharf Firm advised Tamar in the Settlement Discussions and negotiated the April 2016 Draft. Scharf was the principal lawyer who led the team, and he is a close personal friend of Tamar. Riff is a partner in the Scharf Firm who was part of the team.

The Foundation claims that Mendelson, Reich-Ziv, Scharf, and Riff can provide evidence about the factual positions that Lilly and Tamar took during the Settlement Discussions regarding the ownership of the equity in Côte d'Azur. They also claim that the advisors can provide evidence about the filings with the French tax authorities.

Each letter of request seeks the same information. Each lists twenty-seven topics on which the Foundation would like to examine the witness, then identifies nineteen categories of documents to be produced for inspection. The topics for examination encompass the categories of documents, so for simplicity, this decision focuses on the topics for

12

examination. This decision describes the topics in the Legal Analysis, *infra*.

## II.     LEGAL ANALYSIS

Through the letters of request, the Foundation seeks to use the procedures authorized under the Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, which opened for signature on March 18, 1970. 23 U.S.T. 2555, T.I.A.S. No. 7444 (codified as 28 U.S.C. § 1781). "This Convention—sometimes referred to as the 'Hague Convention' or the 'Evidence Convention'—prescribes certain procedures by which a judicial authority in one contracting state may request evidence located in another contracting state." *Societe Nationale Industrielle Aerospatiale v. U.S. Dist. Ct. for the S. Dist. of Iowa*, 482 U.S. 522, 524 (1987).

A party's use of the Hague Convention is neither mandatory nor exclusive. "[T]he optional Convention procedures are available whenever they will facilitate the gathering of evidence by the means authorized in the Convention." *Id.* at 541; *accord Tulip Computers Int'l B.V. v. Dell Computer Corp.*, 254 F. Supp. 2d 469, 472 (D. Del. 2003) ("The Hague Evidence Convention serves as an alternative or 'permissive' route to the Federal Rules of Civil Procedure for the taking of evidence abroad from litigants and third parties alike.").

The party seeking a letter of request bears the burden of persuading the trial court that its issuance is warranted. *Tulip Computers*, 254 F. Supp. 2d at 427. Initially, the discovery sought must be permissible under the law of the requesting jurisdiction such that production would be ordered by the requesting court. *See* Hague Convention, *supra*, art. 1

13

(noting that the request must be "in accordance with the provisions of the law of [the requesting] State").

Next, the court must conduct an additional level of analysis that takes into account the trans-jurisdictional nature of the request. The Supreme Court of the United States has described the general nature of the inquiry as follows:

> American courts, in supervising pretrial proceedings, should exercise special vigilance to protect foreign litigants from the danger that unnecessary, or unduly burdensome, discovery may place them in a disadvantageous position. Judicial supervision of discovery should always seek to minimize its costs and inconvenience and to prevent improper uses of discovery requests. When it is necessary to seek evidence abroad, however, the district court must supervise pretrial proceedings particularly closely to prevent discovery abuses. For example, the additional cost of transportation of documents or witnesses to or from foreign locations may increase the danger that discovery may be sought for the improper purpose of motivating settlement, rather than finding relevant and probative evidence. Objections to "abusive" discovery that foreign litigants advance should therefore receive the most careful consideration. In addition, we have long recognized the demands of comity in suits involving foreign states, either as parties or as sovereigns with a coordinate interest in the litigation. American courts should therefore take care to demonstrate due respect for any special problem confronted by the foreign litigant on account of its nationality or the location of its operations, and for any sovereign interest expressed by a foreign state.

*Societe Nationale*, 482 U.S. at 546 (internal citations omitted).

During this stage, the requesting party again bears the burden of showing that the issuance of a letter of request is warranted, but "[t]hat burden is not great." *Pronova BioPharma Norge AS v. Teva Pharms. USA, Inc.*, 708 F. Supp. 2d 450, 452 (D. Del. 2010). According to a leading treatise, "[a] court should make use of the Convention procedures whenever it is determined on a case-by-case basis that their use will facilitate discovery." 8 Charles Alan Wright, Arthur R. Miller & Richard L. Marcus, *Federal Practice and*

14

*Procedure* § 2005.1 at 70 (3d ed. 2010), Westlaw (database updated Apr. 2022). Resort to the Hague Convention generally will be appropriate when the responding party is not a party to the litigation, has not agreed to respond to discovery voluntarily, and can be compelled to respond through Hague Convention procedures.[3]

## A.    The Hague Convention Is An Available Method.

As a threshold matter, a court can issue a letter of request to a country that has signed the Hague Convention. Israel is a signatory, so the Hague Convention provides one option for discovery.

---

[3] *See, e.g.*, *Cosmo Techs. Ltd. v. Actavis Lab'ys FL, Inc.*, 2016 WL 4582498, at *2 (D. Del. Aug. 31, 2016) (issuing letter of request where witness was located in Italy and possessed evidence that was relevant and unlikely to be duplicative); *Eli Lilly & Co. v. Teva Parenteral Meds., Inc.,* 2013 WL 12291616, at *3 (S.D. Ind. Apr. 26, 2013) ("It is undisputed that Dr. Calvert is a citizen of the United Kingdom. Defendants represent that Dr. Calvert refused to make himself available for deposition or to produce any documents. In these circumstances, Defendants' resort to the Hague Convention appears entirely appropriate."); *Metso Mins. Inc. v. Powerscreen Int'l Distrib. Ltd.*, 2007 WL 1875560, at *3 (E.D.N.Y. June 25, 2007) (finding that use of Hague Convention procedures was warranted where witness had relevant evidence and "the procedures of the Hague Evidence Convention may be the only means by which the requested discovery may be obtained given the fact that Mr. Rafferty is a citizen of Northern Ireland, who is not a party to this action and is similarly not subject to the jurisdiction of this court"); *Tulip Computers*, 254 F. Supp. 2d at 474 ("Resort to the Hague Evidence Convention in this instance is appropriate since both Mr. Duynisveld and Mr. Dietz are not parties to the lawsuit, have not voluntarily subjected themselves to discovery, are citizens of the Netherlands, and are not otherwise subject to the jurisdiction of the Court."); *Orlich v. Helm Bros., Inc.*, 160 A.D.2d 135, 143 (N.Y.A.D. 1990) ("When discovery is sought from a non-party in a foreign jurisdiction, application of the Hague Convention, which encompasses principles of international comity, is virtually compulsory.").

Sometimes a party who opposes the issuance of a letter of request will show that the signatory nation executed the Hague Convention subject to reservations.[4] No one has identified any reservations that are pertinent to this case.

## B. The Court Would Order A Partial Production If The Discovery Were Within Its Control.

As discussed above, the first step in evaluating whether to issue a letter of request asks whether the court would order production if the materials were subject to the court's jurisdiction. For purposes of a Delaware proceeding, that means the discovery must fall within the scope of Rule 26(b)(1), which states:

> Parties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense and proportional to the needs of the case, including the existence, description, nature, custody, condition and location of any documents, electronically stored information, or tangible things and the identity and location of persons having knowledge of any discoverable matter.

Ct. Ch. R. 26(b)(1).

### 1. Relevance

The threshold issue under Rule 26(b) is relevance. "The scope of discovery pursuant to Court of Chancery Rule 26(b) is broad and far-reaching . . . ." *Cal. Pub. Emps. Ret. Sys. v. Coulter*, 2004 WL 1238443, at *1 (Del. Ch. May 26, 2004) (citation omitted). "[T]he spirit of Rule 26(b) calls for all relevant information, however remote, to be brought out

---

[4] *See, e.g.*, *St. Jude Med. S.C., Inc. v. Janssen-Counotte*, 104 F. Supp. 3d 1150, 1167–68 (D. Or. 2015) (discussing Germany's reservations to the Hague Convention); *Eli Lilly,* 2013 WL 12291616, at *2 (discussing the United Kingdom's reservations to the Hague Convention); *In re Vitamins Antitrust Litig.*, 120 F. Supp. 2d 45, 56–57 (D.D.C. 2000) (discussing Belgium's reservations to the Hague Convention).

for inspection not only by the opposing party but also for the benefit of the Court . . . ." *Boxer v. Husky Oil Co.*, 1981 WL 15479, at \*2 (Del. Ch. Nov. 9, 1981). Relevance "must be viewed liberally," and discovery into relevant matters should be permitted if there is "any possibility that the discovery will lead to relevant evidence." *Loretto Literary & Benevolent Inst. v. Blue Diamond Coal Co.*, 1980 WL 268060, at \*4 (Del. Ch. Oct. 24, 1980). "Discovery is called that for a reason. It is not called 'hide the ball.'" *Klig v. Deloitte LLP*, 2010 WL 3489735, at \*7 (Del. Ch. Sept. 7, 2010). To be discoverable, the material can be relevant "to any party's claim or defense." Ct. Ch. R. 26(b)(1).

As a general matter, the Foundation seeks relevant information. Each letter of request seeks "information regarding Mr. Perry's intent to transfer ownership of Côte d'Azur and the Plaintiff's French tax defense." Dkt. 421 ¶ 4. Whether the Deed of Assignment transferred ownership of Mr. Perry's membership in Côte d'Azur is a core issue in the case, and the accuracy of the representations made to French tax authorities go directly to that issue. *See* Dkt. 173 at 49–55.

Lilly argues that the discovery is no longer relevant because the court has dismissed the Foundation's counterclaims. Dkt. 414 at 8. Lilly also argues that the discovery is not probative as to the implementation of the Deed of Assignment. She claims instead that "the motions are an improper attempt to harass foreign, non-party attorneys and obtain generally non-discoverable, privileged, and inadmissible settlement information." *Id.*

It is true that the court has dismissed the Foundation's counterclaims, but that decision does not alter the relevance of the information sought in the letters of request. The Foundation's counterclaims were little more than an EAIAC strategy. That acronym, which

17

stands for "Every Accusation Is A Confession," describes a sophisticated version of the schoolyard response, "I know you are but what am I." It takes whatever charge the other side levels and reflects it back, claiming that the other side has done the same thing but worse. A related phenomenon is "whataboutism," in which a party responds to a charge leveled by the other side with "but what about this," then points to something the other side has done.[5] Both tactics work by distraction. Neither is a valid response to the original charge. Both are sadly becoming more prevalent in this court.

In the counterclaims, the Foundation engaged in blatant EAIACism. Lilly had advanced a claim for fraud against Neupert and the Foundation, so the Foundation and Neupert claimed that Lilly and Tamar had defrauded them. Lilly had advanced a claim for conversion against Neupert and the Foundation based on them seizing control of Côte d'Azur and converting it to a corporation, so the Foundation and Neupert asserted a claim for conversion against Lilly and Tamar. Lilly has sought declaratory judgments regarding the ownership of Côte d'Azur and the validity of certain documents, so the Foundation and Neupert asserted claims for declaratory judgments against Lilly and Tamar.

The court dismissed the Foundation's claims because they were untimely and because they failed on the merits. The effect of that ruling was to prevent the Foundation from seeking affirmative relief on its claims. Those rulings did not affect the scope of the

---

[5] The classic discovery whataboutism involves objections. Party A challenges Party B's assertion of overly broad and facially impermissible general objections. Party B responds by saying, "but what about Party A's objections?" Routine acceptance of whataboutism invariably reduces prevailing practice to the lowest common denominator.

issues that Lilly had raised in the case, nor the ability of the Foundation to litigate defenses to Lilly's claims.

Lilly contends that the Deed of Assignment did not immediately transfer Mr. Perry's member interest in Côte d'Azur to the Foundation and was never subsequently implemented. Lilly has relied on contemporaneous and post-signing evidence to argue that although Mr. Perry might at one point have contemplated a transfer, he never carried out the transfer, and it never became effective.

In the letters of request, the Foundation seeks discovery from the respondents about whether Mr. Perry transferred his member interest in Côte d'Azur to the Foundation. The Foundation seeks in particular to explore the positions that the respondents took during the Settlement Discussions, when the ownership of Côte d'Azur was one of the principal issues on the table. What knowledgeable participants believed and said during those negotiations about the ownership of Côte d'Azur is relevant to the central issue in this case. If the participants in the Settlement Discussions believed and acted as if Mr. Perry still owned the equity in Côte d'Azur as its sole member when he died, then that fact bolsters Lilly's claims. If they did not, then that fact undercuts Lilly's claims.

The Foundation also seeks discovery from the respondents about the representations to the French tax authorities. One of the most powerful sources of evidence regarding Mr. Perry's decision not to implement an *inter vivos* transfer of his membership interest in Côte d'Azur is the fact that he never stopped identifying himself as the ultimate beneficial owner of Côte d'Azur in tax filings in France. One of the most powerful sources of evidence that everyone understood that Mr. Perry owned the membership interest in Côte d'Azur until

19

he died is that after his death, the Perry family and their advisors identified Lilly as the ultimate beneficial owner of Côte d'Azur in its tax filings in France and in their communications with the French tax authorities. One of the Foundation's contentions is that the Mr. Perry did transfer the member interest in Côte d'Azur to the Foundation, but lied about it when he made Côte d'Azur's tax filings in France so that he could lower his tax bill. Put differently, the Foundation bluntly accuses Mr. Perry of tax fraud. If that were true, then the French tax filings would no longer be persuasive. All else equal, showing that the tax filings were part of a fraudulent scheme would make Lilly's position about the ownership of the member interests less likely and the Foundation's position more likely.

The letters of request therefore seek relevant evidence, clearing the first hurdle for their issuance.

### 2. Proportionality And Overbreadth

Discovery must be "proportional to the needs of the case." Ct. Ch. R. 26(b)(1). A sweeping discovery request poses a risk that the discovery will not be proportional. The party objecting to discovery has the burden of showing why the request is improper. *See Van de Walle*, 1984 WL 8270, at *2; *In re Oxbow Carbon LLC Unitholder Litig.*, 2017 WL 959396, at *1 (Del. Ch. Mar. 13, 2017). To carry this burden, "the objection must be specific, the party making it must explain why it applies on the facts of the case to the request being made . . . ." *Oxbow Carbon*, 2017 WL 959396, at *3.

20

### a. The Time Period

When analyzing whether a request is overbroad, the court must consider whether the request covers an excessive time period. The temporal scope of the request should fit the issues in the case.

The Foundation has limited its requests to an appropriate period that starts with the signing of the Deed of Assignment on May 1, 2013, and ends with the conclusion of settlement discussions in summer 2016. *See* Dkt. 421 ¶ 1. The total length of the period is approximately three years, and the end points are tied to relevant events. The time period is appropriate.

### b. The Topics

A court also must analyze whether the topics in the requests are sufficiently tailored. Here, the topics fall into two groups. The first fourteen target communications with identified individuals "regarding the Letter of Wishes, Deed of Assignment, taxes in France, French tax audit, Julien Monsenego, Settlement Discussions, Dieter Neupert, Côte d'Azur, and/or La Treille." The next thirteen do not target communications; they simply identify the following topics:

(15) the BGO Foundation;

(16) the Letter of Wishes;

(17) the Deed of Assignment;

(18) taxes in France;

(19) French tax audit;

(20) Julien Monsenego;

21

(21) Dieter Neupert;

(22) Côte d'Azur Corporation;

(23) La Treille;

(24) the Settlement Discussions relating to Côte d'Azur, and/or La Treille;

(25) the 2015-2016 drafts of the settlement agreement;

(26) the filings to the French Tax Authority regarding Côte d'Azur and/or La Treille; and

(27) any documents produced in response to the letter of request.

As this list shows, all nine of the items that appear as the subjects of communications in each of the first fourteen requests show up in the second group of thirteen topics. It is easier to address them as part of the second group.

Request 27 simply puts the respondent on notice that the Foundation may ask about any documents that they produce. Requests 17, 19, and 22-26 target core issues in the case. There is no risk of overbreadth or lack of proportionality as to those requests. That leaves five requests that could sweep too broadly: (15) the BGO Foundation; (16) the Letter of Wishes; (18) taxes in France; (20) Julien Monsenego; and (21) Dieter Neupert.

Each of these topics presents the same problem. Each topic clearly encompasses issues relevant to this case, but each could encompass issues that go beyond the scope of this case. For example:

- The Foundation claims to own assets other than Côte d'Azur.

- The Letter of Wishes addressed issues other than the ownership and use of the Villa.

- The topic of "taxes in France" could extend beyond Côte d'Azur's tax issues.

- Monsenego may have been involved in matters other than the tax issues associated with Côte d'Azur.

- Neupert was enmeshed in Mr. Perry's affairs, which extended beyond Côte d'Azur. That said, it would not be appropriate to limit the Foundation only to discovery involving those matters to the extent they also touch on the Settlement Discussions or the French tax issues. Some degree of discovery into background issues and adjacent matters is proportionate.

These are standard discovery problems, and litigants must use common sense to reach reasonable solutions. The court is confident that the parties and the respondents can meet the challenge.

The court will not attempt to impose arbitrary limits on the requests in the abstract. The letters of request correctly define the central issue in the case: whether Mr. Perry transferred the equity of Côte d'Azur to the Foundation. Discovery into the Settlement Discussions and the representations to the French tax authorities is proportionate to the extent that it ties back to that issue. Discovery into all of the topics identified in the requests is proportionate to a similar extent. That does not mean the connection must be direct and immediate. Discovery into background issues and adjacent topics can still be relevant and proportionate. But there has to be a credible reason why the discovery would tend to make it more or less likely that Mr. Perry transferred the equity in Côte d'Azur to the Foundation.

### c. Lilly's Prior Production

Lilly argues that the Foundation's requests are "overbroad considering that Plaintiff already produced information concerning the precise topics [the Foundation] identified."

23

Dkt. 414 at 8. Lilly represents that during the jurisdictional phase, she produced communications "regarding Côte d'Azur, French taxes, and a possible settlement agreement that had previously been withheld or redacted." *Id.* at 9. Lilly's argument does not warrant denying the motions.

To the extent Lilly maintains that discovery directed at third parties should be denied simply because the discovery seeks information similar to what was sought from a party, that objection is unfounded. *See Oxbow Carbon*, 2017 WL 617496, at *2. "Courts will usually only forbid such duplication where the objecting party has shown with particularity that the discovery is in fact fully duplicative and is meant merely to harass the interrogated party." *Van De Walle*, 1984 WL 8270, at *2. Obtaining discovery from third parties can "provide some illumination to the parties' divergent accounts." *Grunstein v. Silva*, 2010 WL 1531618, at *4 n.22 (Del. Ch. Apr. 13, 2010). It is also important to the truth-finding process, because "[s]ubmitting the same requests to different individuals might allow Plaintiff to test the truth, accuracy, and completeness of extant and forthcoming production." *Hamilton P'rs, L.P. v. Highland Cap. Mgmt., L.P.*, 2016 WL 612233, at *6 (Del. Ch. Feb. 2, 2016) (internal quotation omitted).

Lilly's argument also ignores that two of the letters of request are directed to Scharf and Riff, who were advisors to Tamar. There is no reason to think that Lilly's prior collection produced responsive materials from them.

Coloring the analysis is the fact that discovery in this case has been difficult, with neither side being as forthcoming as the court expects. The Foundation previously sought and obtained an adverse inference based on Lilly's failure to produce documents from a

24

computer that she controlled. Dkt. 145. There is also reason to think Lilly has not collected documents from Mendelson or Reich-Ziv because the Foundation represents that she did not produce or log any. *See* Dkt. 421 ¶¶ 11–12. Lilly's prior production does not warrant denying the motions.

### 3.    Privilege

Under Rule 26, discovery extends to "any non-privileged matter." Ct. Ch. R. 26(b)(1). Lilly argues that the letters of request should not issue because the respondents' status as lawyers will implicate privilege. That objection would not carry the day if the court had jurisdiction over the respondents. The court would order production, allow the respondents to serve privilege logs, and then adjudicate any disputes over privilege.

#### a.    No Privilege As To External Communications

Initially, Lilly's argument ignores a fundamental limitation on the scope of the privilege. Under Delaware law,

> [a] client has a privilege to refuse to disclose and to prevent any other person from disclosing confidential communications made for the purpose of facilitating the rendition of professional legal services to the client (1) between the client or the client's representative and the client's lawyer or the lawyer's representative, (2) between the lawyer and the lawyer's representative, (3) by the client or the client's representative or the client's lawyer or a representative of the lawyer to a lawyer or a representative of a lawyer representing another in a matter of common interest, (4) between representatives of the client or between the client and a representative of the client, or (5) among lawyers and their representatives representing the same client.

D.R.E. 502(b). A communication is not privileged when it goes outside the protected circle.

When parties are engaged in adversarial negotiation, they do not share a common interest sufficient to support privilege. *See Zirn v. VLI Corp.,* 1990 WL 119685, at *8 (Del.

25

Ch. Aug. 13, 1990); *Jedwab v. MGM Grand Hotels, Inc.*, 1986 WL 3426, at *2 (Del. Ch. Mar. 20, 1986). The desire to conclude a business deal, or to achieve a settlement, does not give rise to a common interest for purposes of privilege. Thus, "communications about a business deal, even when the parties are seeking to structure a deal so as to avoid the threat of litigation, will generally not be privileged under the common interest doctrine." *Glassman v. Crossfit, Inc.*, 2012 WL 4859125, at *4 (Del. Ch. Oct. 12, 2012); *accord Buttonwood Tree Value P'rs, L.P. v. R. L. Polk & Co.*, 2021 WL 3237114, at *8 (Del. Ch. July 30, 2021).

Under this rule, much of the material in the respondents' possession will not be privileged. For example, external communications exchanged among Lilly, Tamar, Yael, LOPAG, and Neupert, whether directly or through their advisors, will not qualify for protection.

Doubtless there will be documents that fall outside this rule and which could be privileged. A confidential, internal email between Mendelson and Lilly could be privileged. An email from Mendelson to Scharf or Riff or Tamar or Neupert or LOPAG or any of LOPAG's advisors would not (and those are just examples).

The Foundation is entitled to obtain non-privileged material. The record already reflects lots of emails exchanged among the members of the Perry family and their advisors in settings where no common interest exists. That material is not privileged.

### b. The At-Issue Exception

Lilly's argument also ignores the at-issue exception and this court's prior ruling on that topic. A party waives privilege under the at-issue exception when "(1) the party injects

the attorney-client communication themselves into the litigation, or (2) the party injects an issue into the litigation, the truthful resolution of which requires an examination of attorney-client communications." *Fitzgerald v. Cantor*, 1999 WL 64480, at \*2 (Del. Ch. Jan. 28, 1999). The exception is grounded on "principles of waiver and fairness" and ensures that a party holding a privilege "cannot use it both offensively and defensively." *Princeton Ins. Co. v. Vergano*, 883 A.2d 44, 59 (Del. Ch. 2005).

During the jurisdictional phase, the Foundation sought production of communications between Lilly and her counsel about representations made to the French tax authorities. In response to Lilly's invocation of privilege, the court ruled that Lilly had placed the communications at issue and ordered their production. The court held that "anything that has to do with the communications with counsel regarding the French tax authorities or French tax assessment" would be produced because "Lilly has placed that subject matter at issue in this case." Dkt. 173 at 53–56. The court determined that it would not be fair to allow Lilly "to use those communications as a sword while invoking privilege for similar communications." *Id.* at 53.

That ruling still applies. Lilly therefore cannot invoke privilege to protect communications with Mendelson, Reich-Ziv, or other lawyers with the Mendelson Firm or their representatives that relate to the French tax audit, the French tax filings, or communications with the French authorities.

It would be premature at present to extend this ruling to Scharf and Riff. The court's earlier ruling only applied to Lilly, not to Tamar. Nevertheless, there is evidence that Lilly and Tamar have worked together to pursue litigation in various jurisdictions, and it is

27

possible that good cause might exist to issue a similar ruling as to Tamar and her advisors. If Tamar's lawyers invoke privilege on Tamar's behalf for matters involving the French tax issues, then they will need to produce a privilege log. At that point, the Foundation can decide whether to pursue an at-issue argument against Tamar.

### c. The Crime/Fraud Exception

The Foundation argues that privilege also is not likely to be at issue because of the crime/fraud exception. To date, a sufficient showing has not been made to invoke the crime/fraud exception against Lilly, Tamar, and their advisors.

Delaware Rule of Evidence 502 shields from discovery any "confidential communications made for the purpose of facilitating the rendition of professional legal services to the client." D.R.E. 502. An exception applies when "the services of the lawyer were sought or obtained to enable or aid anyone to commit or plan to commit what the client knew or reasonably should have known to be a crime or fraud." *Id.* 502(d)(1).

The premise behind the crime/fraud exception is "that when a client seeks out an attorney for the purpose of obtaining advice that will aid the client in carrying out a crime or a fraudulent scheme, the client has abused the attorney-client relationship and stripped that relationship of its confidential status." *Vergano*, 883 A.2d at 55. For the crime/fraud exception to apply, the client must intend to use the communications "as a basis for criminal or fraudulent activity, whether or not that criminal or fraudulent intent ever comes to fruition." *In re Sutton*, 1996 WL 659002, at *11 (Del. Super. Aug. 30, 1996). "To invoke the crime-fraud exception, . . . the proponent of the exception must make a prima facie

28

showing that the confidential communications were made in furtherance of a crime or fraud." *Buttonwood*, 2018 WL 346036, at \*6, \*8 (cleaned up).

During the jurisdictional phase, Lilly sought production of documents from Neupert relating to the Deed of Assignment and the French tax authorities. Neupert invoked privilege, and Lilly moved to compel. The court ruled that Neupert's actions bore sufficient hallmarks of fraudulent and potentially criminal conduct to invoke the crime/fraud exception. Dkt. 174 at 46–48. The court's ruling extended to "Neupert, his firm, and the other firms that were engaged in making representations to the French tax authorities and to the Delaware Secretary of State." *Id.* at 47. The court expressly extended the ruling to Olswang, to the Cofes firm, to a French lawyer named Sophie Lesage, and to the Zeichner firm. *Id.* at 48. The court's ruling did not apply to Lilly. It also did not apply to Tamar. It therefore does not apply to their Israeli attorneys.

### 4.     Rule 408

As a final argument against the letters of request, Lilly contends that any documents or communications relating to the Settlement Discussions are not subject to production because they would be inadmissible under Delaware Rule of Evidence 408. That argument is frivolous.

Rule 408 states that evidence concerning settlement negotiations "is not admissible on behalf of any party either to prove or disprove the validity or amount of a disputed claim or to impeach by a prior inconsistent statement or a contradiction . . . ." D.R.E. 408. Rule 408 thus potentially makes settlement discussions inadmissible, but that possibility does not affect whether they are discoverable. Rule 26(b)(1) states explicitly: "It is not ground

29

for objection that the information sought will be inadmissible at the trial." Ct. Ch. R. 26(b)(1). Rule 408 does not present an impediment to the production of material relating to the Settlement Discussions.

**C.      Letters Of Request Are Warranted Notwithstanding The Burden On A Foreign Court System.**

If the respondents were subject to this court's jurisdiction, the court would order them to produce the discovery that the Foundation seeks. Because the Foundation seeks the issuance of letters of request to the central authority of a foreign jurisdiction, the court must engage in additional analysis to determine whether to impose a burden on courts in a foreign jurisdiction. In this case, the Foundation has made the necessary showing.

In *Societe Nationale*, the Supreme Court of the United States identified five factors to consider when determining whether to issue a letter of request. To reiterate, the five factors are:

- the importance to the litigation of the documents or other information requested;

- the degree of specificity of the request;

- whether the information originated in the United States;

- the availability of alternative means of securing the information; and

- the extent to which noncompliance with the request would undermine important interests of the United States, or compliance with the request would undermine important interests of the state where the information is located.

*Societe Nationale*, 482 U.S. at 544 n.28; *see* Restatement (Third) of Foreign Relations Law §§ 441–442 (Am. L. Inst. 1987), Westlaw (database updated Oct. 2022). Evaluating these factors "requires a particularized analysis of the facts of a case, the sovereign interests

involved, and the likelihood that resorting to the Hague Convention will prove effective." *Ingenico Inc. v. Ioengine, LLC*, 2021 WL 765757, at \*2 (D. Del. Feb. 26, 2021).

### 1. The Importance Of The Documents Requested

The first factor requires an assessment of the importance of the documents or other information to the litigation. *Societe Nationale*, 482 U.S. at 544 n.28. This factor "calls on the court to consider the degree to which the information sought is more than merely relevant under the broad test generally for evaluating discovery requests." *In re Activision Blizzard, Inc.*, 86 A.3d 531, 544 (Del. Ch. 2014). To meet its burden, the requesting party must go beyond "conclusory assertions" that the evidence sought is relevant to the litigation. *Ingenico*, 2021 WL 765757, at \*3. Production is favored where the requesting party shows that the evidence sought is "directly probative to the issues of the case." *Chevron Corp. v. Donziger*, 296 F.R.D. 168, 204 (S.D.N.Y. 2013) (quoting *Reino de Espana v. Am. Bureau of Shipping*, 2005 WL 1813017, at \*7 (S.D.N.Y. Aug. 1, 2005)). But the requesting party need not show the requested documents are vital to the litigation. *Id.*

For the reasons already discussed, the discovery sought is relevant and likely to be probative on the core issue in the case. The first factor favors granting the letters of request.

### 2. The Degree Of Specificity Of The Request

The second factor directs the court to consider the degree of specificity of the request. *Societe Nationale*, 482 U.S. at 544 n.28. A request must be sufficiently specific to avoid confronting the producing party with "unnecessary, or unduly burdensome discovery" that places the producing party "in a disadvantageous position." *Id.* at 546; *see*

31

*Activision*, 86 A.3d at 545. The second factor's specificity requirement interacts with the first factor's emphasis on importance. *See Ingenico*, 2021 WL 765757, at *4. A sweeping document request both lacks specificity and is likely to capture evidence of limited importance. *See id.* (finding that a "conclusory assertion" that the requested evidence was relevant failed the first and second factors of the five-factor test).

For the reasons already discussed, the requests are sufficiently specific. The discovery is neither unnecessary nor unduly burdensome. The second factor favors granting the letters of request.

### 3. Whether The Information Originated In The United States

The third factor directs the court to consider "whether the requested information originated in the United States." *Societe Nationale*, 482 U.S. at 544 n.28. This factor is primarily concerned with helping a court evaluate whether discovery can be obtained either under the court's rules or under the Hague Convention. *See Catalano v. BMW of N. Am., LLC*, 2016 WL 3406125, at *7 (S.D.N.Y. June 16, 2016) (evaluating whether documents located in Germany should be obtained under the Hague Convention even though defendant was a party to the case and subject to discovery under the Federal Rules of Civil Procedure); *Activision*, 86 A.3d at 546 (evaluating whether the Hague Convention should be used to obtain documents that were located in France, even though the defendant was a party to the case and subject to party discovery). Although framed in terms of where the information originated, this factor is more concerned with the physical location of the information. *See Milliken & Co. v. Bank of China*, 758 F. Supp. 2d 238, 247 (S.D.N.Y. 2010). If the requested information is located in a foreign jurisdiction where local laws

32

would impose additional compliance obligations on a producing party, then this factor may favor the use of the Hague Convention so that the central authority in that jurisdiction can take those obligations into account. In an extreme case where compliance would be particularly burdensome or contrary to law, this factor may counsel in favor of not issuing a letter of request at all.

In this case, the respondents are located in Israel. Any documents or other information they may possess are likely located in Israel. That fact is largely irrelevant to the balancing of interests because the Foundation is already proceeding by seeking letters of request. Moreover, as discussed in the next section, that method likely provides the only means of obtaining the discovery. No one has identified any Israeli legal requirements that would limit or prevent production. The third factor supports the issuance of the letters of request.

## 4. The Availability Of Alternative Means Of Securing The Information

The fourth factor looks to whether alternative means of securing the requested information are available. *Societe Nationale*, 482 U.S. at 544 n.28. If there is an alternative means of obtaining the information that will generate the same or substantially equivalent discovery without burdening a foreign court system, then that fact counsels in favor of using the alternative method. *See Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1476 (9th Cir. 1992); *Milliken*, 758 F. Supp. 2d at 247. If there is no alternative source, then this factor favors issuing the letter of request. *Activision*, 86 A.3d at 546. If the party from whom materials are requested has refused to comply with the alternative

33

method of production, then this factor again favors issuing the letter of request. *Ingenico*, 2021 WL 765757, at *3. When the Hague Convention is the only feasible means of acquiring the evidence, resort to a letter of request is "virtually compulsory." *Liqwd, Inc. v. L'Oréal USA, Inc.*, 2018 WL 11189616, at *2 (D. Del. Nov. 16, 2018).

The Foundation contends that the Hague Convention is the only feasible way to procure the discovery because the respondents are not parties to this case or otherwise subject to the court's jurisdiction. Lilly only disputes the Foundation's position to the extent the Foundation seeks communications with Neupert, which Lilly says the Foundation could obtain from Neupert directly. In a decision granting a motion that Lilly filed seeking a letter of request, the court explained why obtaining discovery from Neupert is not viable. *In re Cote d'Azur Est. Corp.*, 2022 WL 17077551, at *12–13 (Del. Ch. Nov. 18, 2022). The same reasoning applies here.

The Foundation thus has shown it likely has no alternative means of procuring the discovery sought. The fourth factor favors production.

### 5. The Competing Interests Of The Sovereigns Involved

The final factor is a balancing of the competing interests of the sovereigns involved. *Societe Nationale*, 482 U.S. at 544 n.28. Under this factor, the court weighs any interest that the United States or the forum state has in obtaining production of the information against any interest that the foreign state has in not providing discovery. *Activision*, 86 A.3d at 547. When considering the interests of the United States, the court may take into account the requesting party's "important interests in developing its claims and defenses." *Ingenico*, 2021 WL 765757, at *3. When considering the interests of a foreign state, the

34

court should take into account any foreign law that limits production. *See Activision*, 86 A.3d at 547 (giving consideration to French laws regarding data privacy).

This factor is most important where the litigation implicates national security concerns or national economic policies.[6] No such concern is implicated here. This is a civil case involving private parties. Where the litigants are all private parties, this factor is of secondary importance. *See Milliken*, 758 F. Supp. 2d at 248 ("Here, the underlying interest—collection of a judgment by a private party—is not so dramatic.").

Although it is difficult to say that the United States has a significant interest in this dispute, the interests of the forum state are pertinent. "Delaware has a substantial interest in providing an effective forum for litigating disputes involving the internal affairs of Delaware [business entities]." *Activision*, 86 A.3d at 547. "Delaware's legitimacy as a chartering jurisdiction depends on it." *NACCO Indus., Inc. v. Applica, Inc.*, 997 A.2d 1, 26 (Del. Ch. 2009). Delaware therefore has an interest in providing a forum for this dispute.

---

[6] *See, e.g.*, *In re Grand Jury Investigation of Possible Violations of 18 U.S.C. § 1956 and 50 U.S.C. § 1705*, 381 F. Supp. 3d 37, 72 (D.D.C. 2019) ("[T]he United States' interest in this case pertains to national security . . . . Consequently, non-enforcement would undermine a critical national interest."); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 278 F.R.D. 51, 54 (E.D.N.Y. 2010) (noting the fifth factor is "considered most important by several courts" where "a case involv[ed] violations of antitrust laws whose enforcement is essential to the country's interests in a competitive economy"); *Strauss v. Credit Lyonnais, S.A.*, 249 F.R.D. 429, 443–44 (E.D.N.Y. 2008) ("When that interest [of adjudicating matters before its courts] is combined with the United States's [sic] goals of combating terrorism, it is elevated to nearly its highest point, and diminishes any competing interests of the foreign state." (internal quotation marks omitted)).

Lilly has not identified any counterbalancing Israeli interests. She also has not cited any Israeli statute or directive that would limit production. To the extent local Israeli law on privilege would offer greater protection, the Hague Convention contemplates that a central authority can take into account local privilege law by providing that "[i]n the execution of a Letter of Request the person concerned may refuse to give evidence in so far as he has a privilege or duty to refuse to give the evidence . . . under the law of the State of execution." Hague Convention, *supra*, art. 11.

There accordingly does not appear to be any conflict between the interests of competing sovereigns. Delaware has an interest in obtaining information necessary for the litigation of a civil dispute. Israel does not appear to have any countervailing interest. The fifth factor therefore supports the issuance of the letter of request.

### 6. The Overarching Balancing

The court must perform an overarching balancing of the five factors identified in *Societe Nationale*. All of the factors favor the issuance of a letter of request, either strongly or weakly. No factor counsels against the issuance. The Foundation has therefore carried its burden.

### III. CONCLUSION

The Foundation has shown that issuance of the letters of request is warranted. The Foundation's existing motions predated this court's decision dismissing its counterclaims. To avoid confusion, the Foundation will submit new letters of request that remove references to the Foundation's counterclaims.